26cr90 SRN/ECW

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, | **INDICTMENT** |
| Plaintiff, | 18 U.S.C. § 1347 |
| | 18 U.S.C. § 2 |
| v. | 18 U.S.C. § 982(a)(7) |
| | 21 U.S.C. § 853(p) |
| SHARMAINE MEADOWS, | 28 U.S.C. § 2461(c) |
| Defendant. | |

**THE UNITED STATES GRAND JURY CHARGES THAT:**

At all times relevant to this Indictment:

1. Medicaid was a health and long-term care coverage program jointly financed by states and the federal government pursuant to the Social Security Act of 1965 that provided benefits to individuals and families who met specified financial and other eligibility requirements, and certain other individuals who lacked adequate resources to pay for medical care. The Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services, was responsible for overseeing Medicaid in participating states, including Minnesota.

2. Individuals who received benefits under Medicaid were referred to as "recipients."

3. Medicaid was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).


SCANNED
MAY 07 2026
U.S. DISTRICT COURT MPLS

*United States v. Meadows*

4.  Each state, including Minnesota, established and administered its own Medicaid program and determined the type, amount, duration, and scope of services covered within broad federal guidelines.

5.  Medicaid covered the costs of medical services and products ranging from routine preventive medical care for children to institutional care for the elderly and disabled. Service providers were authorized to submit claims to Medicaid only for services they actually rendered and were required to maintain patient records verifying the provision of services. By submitting a claim, the provider certified, among other things, that the services medically necessary, rendered to the patient as represented, and not rendered as a result of kickbacks or bribes.

6.  In Minnesota, Medicaid was administered by the Minnesota Department of Human Services ("DHS").

**A. Background on Minnesota's Housing Stabilization Services Program**

7.  Beginning in or around July 2020, DHS began operating the Housing Stabilization Services ("HSS") Program ("the Program"), which was funded through the state's Medicaid program. The Program was designed to help seniors and people with disabilities, including mental illness and substance use disorders, find and maintain housing.

8.  The Program permitted reimbursements for four principal kinds of services:

> (a) Housing consultation, during which a consultant (like a social worker or nurse) helped a recipient complete a DHS form called a Person-Centered, Housing Focused Plan. The form required minimal information.

*United States v. Meadows*

Consultants could bill Medicaid approximately $174 for a consulting session.

(b) Housing transition services, during which a provider helped a recipient plan for, find, and move into housing. Providers could bill approximately $68 per hour of transition services provided.

(c) Housing sustaining services, during which a provider helped a recipient keep their housing after they had moved in (including through behavioral management of the recipient). Providers could bill approximately $68 per hour of sustaining services provided.

(d) Moving expenses of up to $3,000, subject to conditions.

9.     The Program had the following requirements to enroll as a provider: (i) be at least 18 years old, (ii) submit enrollment application to DHS, (iii) undergo a background check, and (iv) complete approximately five hours of online training videos.

10.     The Program had the following requirements to enroll as a recipient: (i) be at least 18 years old, (ii) have Medicaid coverage, (iii) have a documented disability or "disabling condition," and (iv) be experiencing housing instability. To receive billable services, a recipient meeting these requirements was required to complete a form called a Person-Centered Housing Focused Plan, detailing their housing challenges and needs. Once submitted, the recipient could enroll with a provider, and the provider could start billing the Program.

11.     To bill, a provider submitted the names of the recipient serviced, the type of billable service provided, and the number of hours worked.

## B. The Defendant

12.     The defendant, SHARMAINE MEADOWS, owned and operated Cradle of Love, LLC ("Cradle").

13.     In or around June 2019, MEADOWS registered Cradle with the Minnesota Secretary of State. In or around May 2020, MEADOWS submitted paperwork to enroll Cradle as a provider in the HSS Program. MEADOWS was responsible for the submission of claims to the HSS Program on behalf of Cradle.

14.     In the process of enrolling as a provider with DHS, MEADOWS certified she would not submit false or fraudulent claims. She also completed mandatory training instructing her as to the services for which she was permitted to submit claims. MEADOWS, by and through Cradle, began submitting claims to the Program in or around August 2020.

15.     Through Cradle, MEADOWS was supposed to provide housing consulting, transitioning, and sustaining services to qualifying people in need. Cradle was paid at quarter-hourly rates and with Medicaid dollars based on the services it claimed to provide.

## C. The Scheme to Defraud the HSS Program

16.     From in or around August 2020 through in or around October 2025, in the District of Minnesota and elsewhere, the defendant, SHARMAINE MEADOWS, did knowingly devise and participate in a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicaid, and to obtain, by means of materially false and

4

fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services.

17. It was the purpose of the scheme for MEADOWS to unlawfully enrich herself, by, among other things: (a) submitting and causing the submission of false and fraudulent claims to the HSS Program (i) that inflated the number of hours of service actually provided, (ii) for services that were not actually provided, and (iii) for services that were not eligible for reimbursement; (b) concealing the submission of false and fraudulent claims to the HSS Program and the receipt and transfer of proceeds of the fraud; and (c) diverting proceeds of the fraud for the personal use and benefit of MEADOWS and others, and to further the fraud scheme.

18. The manner and means by which MEADOWS executed the scheme included, among other things, the following:

a. In or around August 2019, February 2020, and May 2020, MEADOWS signed DHS Provider Agreements on behalf of Cradle in which she promised to: (i) "[c]omply with all federal and state statutes and rules relating to the delivery of services to individuals and to the submission of claims for such services"; (ii) "[a]ssume full responsibility for the accuracy of claims submitted to DHS"; (iii) "[s]ubmit claims . . . only after the . . . service has been provided"; (iv) ensure that "employees and contractors comply with all [Minnesota Health Care Programs] requirements"; (v) "[m]aintain records that fully disclose the extent of services provided" to Medicaid recipients; and (vi)

"[r]efund any overpayments" received, including those resulting from payments made due to "fraudulent billing."

b.      In or around May 2020, MEADOWS signed a DHS HSS Provider Enrollment Agreement on behalf of Cradle in which she acknowledged that any misrepresentations in information submitted to DHS, including false claims or the concealment of a material fact, may be cause for denial or termination of participation as a Medicaid provider.

c.      On or about January 11, 2020, MEADOWS opened a Bank of America checking account, ending in x6623, in the name of Cradle for the purpose of receiving reimbursement from DHS. MEADOWS was the sole signatory on the account.

d.      MEADOWS directed Cradle employees to report identical quantities of hours per Medicaid recipient per week, up to the maximum allowed amount, when, in fact, those services were not actually provided.

e.      MEADOWS knowingly and willfully submitted, and directed others to submit, claims to Medicaid for HSS purportedly provided to Medicaid recipients on dates and times when, in fact, those recipients were hospitalized and could not have received the claimed services.

f.      MEADOWS knowingly and willfully submitted, and directed others to submit, claims to Medicaid for HSS that were purportedly provided by Cradle employees on specific dates that, when aggregated, were temporally impossible.

*United States v. Meadows*

g.     MEADOWS knowingly and willfully submitted, and directed others to submit, claims to Medicaid for HSS purportedly provided to Medicaid recipients that were never actually provided.

h.     From in or around August 2020 through in or around October 2025, MEADOWS, through Cradle, billed Minnesota Medicaid approximately $4.3 million for HSS purportedly provided to Medicaid recipients and received nearly $3.7 million based on those false and fraudulent claims.

## Counts 1 through 3
(Health Care Fraud)

19.     Paragraphs 1 through 18 of this Indictment are re-alleged and incorporated herein.

20.     On or about the dates specified below, in the District of Minnesota and elsewhere, MEADOWS, aided and abetted by others known and unknown to the Grand Jury, did knowingly and willfully execute, and attempt to execute, a scheme and artifice to defraud a health care benefit program affecting commerce, that is, Medicaid, and to obtain by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, Medicaid, in connection with the delivery of, and payment for, health care benefits, items, and services, by causing the submission of the following false and fraudulent claims to Medicaid:

7

*United States v. Meadows*

| Count | Medicaid Recipient | Approx. Date of Service | Medicaid Claim Number | Approx. Amount Claimed |
|---|---|---|---|---|
| 1 | A.T. | July 22,2022 | 7222300040203 1366 | $206.04 |
| 2 | S.R. | October 24, 2023 | 7233320040308 2618 | $343.40 |
| 3 | P.D. | November 28, 2023 | 5233400040004 9864 | $120.19 |

Each in violation of Title 18, United States Code, Sections 1347 and 2.

8

*United States v. Meadows*

## FORFEITURE ALLEGATIONS
### (18 U.S.C. § 982(a)(7) and 28 U.S.C. § 2461)

21.     The allegations contained in Counts 1 through 3 of this Indictment are incorporated by reference as if set forth fully herein for the purpose of alleging forfeiture against defendant SHARMAINE MEADOWS, pursuant to the provisions of Title 18, United States Code, Section 982 and Title 28, United States Code, Section 2461.

22.     Pursuant to Title 18, United States Code, Section 982(a)(7), upon being convicted of the crimes charged in Counts 1 through 3 of this Indictment, the convicted defendant shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense.

23.     Money Judgment:  Property subject to forfeiture includes, but is not limited to, a forfeiture money judgment equal to total amount of forfeitable proceeds as a result of defendant's violations as alleged in Counts 1 through 3 of this Indictment.

24.     Substitute Assets:  If the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

      a.  cannot be located upon the exercise of due diligence;

      b.  has been transferred or sold to, or deposited with, a third party;

      c.  has been placed beyond the jurisdiction of the Court;

      d.  has been substantially diminished in value; or

*United States v. Meadows*

e.  has been commingled with other property that cannot be

subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section

853(p) as incorporated by Title 18, United States Code, Section 982(b) and/or Title

28, United States Code, Section 2461, to seek to forfeit any other property of

SHARMAINE MEADOWS, up to the value of such property.

A TRUE BILL

_____          _____
UNITED STATES ATTORNEY                    FOREPERSON

_____
LORINDA LARYEA
Chief
Criminal Division, Fraud Section
U.S. Department of Justice

10