UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

CASE NO. 26-CR-90 (SRN/ECW)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff,<br><br>v.<br><br>SHARMAINE MEADOWS<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **UNITED STATES' TRIAL BRIEF** |

The United States of America respectfully submits this trial brief pursuant to the Court's July 23, 2026, scheduling order. Dkt. 27. Below the United States provides a brief overview of the case and the elements of the charged offenses before previewing the United States' case-in-chief and flagging several issues for the Court that the United States believes may arise during trial.

**Background**

On May 7, 2026, a grand jury in this District returned an indictment charging the Defendant with health care fraud, alleging three counts of violations of 18 U.S.C. § 1347 and 18 U.S.C. § 2, in connection with a Medicaid fraud scheme. Dkt. 1. Trial is scheduled to commence on September 25, 2026. Dkt. 27.

As alleged in the Indictment, Defendant Sharmaine Meadows ("Defendant") owned and operated Cradle of Love, LLC ("Cradle"), which was based in St. Paul, Minnesota. Meadows first enrolled as a provider in the Housing Stabilization Services ("HSS") Program in or around May 2020. The HSS Program was a program administered by the Minnesota Department of Human Services ("DHS") for Medicaid recipients and which was designed to help seniors and people with disabilities, including mental illness and substance use disorders, find and maintain housing.

The HSS Program offered several categories of housing support, three of which are most pertinent here[1]:

i. Housing transition services: The Program provided Medicaid coverage for a housing transition services provider to help a person plan for, find, and move into housing. According to DHS, housing transition services included assisting with the housing search and application process, helping to understand and develop a budget, helping to negotiate and understand a lease, and providing transportation. According to information obtained from DHS, housing transition services were reimbursed at a rate of $17.17 per 15-minute unit of service, which equated to $68.68 per hour. Under the Program, pay-outs for housing transition services were generally capped at 150 hours—or $10,302—per year per Medicaid recipient.

ii. Housing sustaining services: The Program provided Medicaid payment for a "housing sustaining services" provider to help a person keep their housing after they have moved in. According to DHS, housing sustaining services included, among other things: developing, updating, and modifying the housing support and crisis/safety plan on a regular basis; preventing and early identifying of behaviors that may jeopardize continued housing; educating and training on roles, rights, and responsibilities of the tenant and property manager; promoting/supporting cultural practice needs and understandings with landlords, property managers, and neighbors; and advocating with community resources to prevent eviction when housing is at risk and maintain the person's safety. According to information obtained from DHS, housing sustaining services were reimbursed at a rate of $17.17 per 15-minute unit of service, which equates to $68.68 per hour. Like housing transition services, under the program, pay-outs for housing sustaining services were generally capped at 150 hours—or $10,302—per year per Medicaid recipient.

iii. Moving expenses: In addition to housing consultations, housing transition services, and housing sustaining services, the HSS program also provided up to $3,000 to assist individuals with the cost of moving into their own home from a provider-controlled setting, such as an addiction treatment center.

To permit Cradle's participation in the HSS Program, Meadows signed agreements with DHS on behalf of Cradle in which she represented and promised to: comply with all federal and state statutes and rules relating to the delivery of services and submission of claims; assume full responsibility for the accuracy of claims; submit claims only after services had been provided;

[1] The other category, housing consultation, is not the primary focus of this case. This form of support paid a consultant to develop a person-centered plan for meeting their housing needs. This support was paid at a one-time flat fee of $174.22.

ensure that employees and contractors comply with requirements; maintain records that fully disclose the extent of services provided; and refund any overpayments received. At trial, the United States anticipates proving that the Defendant misrepresented her adherence to these requirements, broke these promises, and utilized Cradle to defraud Medicaid in in two primary ways.

First, Meadows submitted, and directed others to submit, claims to Medicaid for HSS purportedly provided to Medicaid recipients which falsely inflated or overstated the amount of time spent providing services to the Medicaid recipient. For example, Meadows directed Cradle's client-facing employees to report specific quantities of hours per Medicaid recipient per week, up to the maximum allowed amount.

Second, Meadows submitted, and directed others to submit, claims to Medicaid for HSS purportedly provided to Medicaid recipients that were never actually provided or for services that were not eligible for reimbursement. This included, *inter alia*, services purportedly provided to Medicaid recipients on dates and times when, in fact, those recipients were hospitalized and could not have received the claimed services. In total, from in or around August 2020 through in or around October 2025, Cradle billed Medicaid approximately $4.3 million for HSS services purportedly provided to Medicaid recipients and received nearly $3.7 million based on false and fraudulent claims.

The indictment alleges as examples of the Medicaid fraud scheme three claims submitted by Cradle to DHS for payment on behalf of three different HSS recipients, which were submitted even though the claims were false and fraudulent and based on services that were not actually rendered.

## I. <u>Anticipated Facts at Trial</u>

The United States will introduce evidence proving that the Defendant used her business to take advantage of HSS-eligible Medicaid recipients who needed and wanted housing assistance.

Defendant and her employees and contractors then used these clients to regularly and systematically submit HSS claims that either significantly overstated or wholesale invented purported housing transition and housing sustaining services provided to clients. In this way, Defendant turned the maximum number of 15-minute service units for each client into a regular billing stream to fund profits for the Defendant and her company.

To generate false claims, Meadows directed Cradle employees to maximize HSS Program hours and directed her managers to enforce that requirement with employee-case workers. This included directing workers to round up short check-in calls or emails into multiple hours of services and directing them to round up for full hours of services despite clear HSS rules prohibiting such up-charging. Her directives were not tailored to the individual needs of each Medicaid recipient, and instead evidence will show it was premised exclusively on maximizing profit. When Cradle received complaints about its employees not providing services, or using up multiple recipients' entire budgeted service units despite not actually helping persons who needed housing find such housing, Cradle nonetheless submitted and accepted payment for such false and overstated claims, even where the Defendant directed disciplinary action against the employees in question.

With respect to each of the three counts that illustrate the larger scheme to defraud, the United States will present evidence that the services claimed for the recipients identified in those counts could not have occurred in the manner or amount claimed and stated in the underlying timesheet and client records purporting to document the claims.

## II. United States's Evidence

### A. Witnesses

To prove the scheme outlined above, the United States anticipates calling the following categories of witnesses:

1. **Opinion Witnesses**: The United States will call opinion witnesses from the Minnesota State Department of Health to describe Medicaid and the HSS program and how they operate (or in the case of the HSS Program, was intended to operate), including discussing Medicaid and HSS rules and regulations, HSS enrollment records, HSS claims data, including with respect to specific beneficiaries (all of which will be further described in the United States's expert disclosures).
2. **Cradle Employees**: The United States will call Cradle employees who were instructed by Defendant and others to direct Cradle's housing advocates to maximize billing despite not providing billed for services.
3. **Medicaid Recipient Witnesses**: The United States will call Medicaid recipients who were targeted by the Defendant's scheme and can speak to the services that they wanted but did not receive from Cradle.
4. **United States' Witnesses**: The United States will call a financial analyst to present financial records and summaries of those records and a case agent or agents to present communications, recordings, invoices, and other evidence of the scheme.

### B. Evidentiary Matters

#### 1. 404(b) Evidence

As will be described in more detail in a 404(b) Notice to be filed by September 4, 2026, (Dkt 25 ¶ 15), the United States intends to elicit testimony and present documentary evidence that illustrates the fraudulent manner in which Defendant operated her business, which purported to provide not only HSS services, but other publicly funded services to Medicaid recipients and recipients of other Minnesota state-funded programs.

Some Medicaid recipients who were billed by Cradle of Love for HSS services, were also billed by Cradle for other Medicaid-reimbursed social services, such as In-Home Support (IHS)

and Respite Care. The records for these other programs mirror the pattern shown in Cradle's HSS operations in that Cradle workers were directed to maximize the billings claimed for Cradle clients, regardless of actual time spent or services provided.

Further, there are internal Cradle communications showing that Defendant was aware of claims for services in the HSS and other program areas that included either upcharging the amount of units or hours of service provided or wholesale invention of hours of service not provided at all. As such, Cradle's pattern and practice of engaging in rote and regular upcharging for HSS services is intertwined with its business practices across all of its service program areas. Even if the evidence is not found to be sufficiently intertwined to constitute intrinsic evidence of Meadows' culpability, the evidence would still be admissible under Rule 404(b) to show Meadows' knowledge, absence of mistake, and the regular practices and patterns in operating her business to commit fraud.

**2. Statements Made by Participants in the Scheme**

The United States anticipates offering statements made not only by the Defendant herself, but by her co-participants in the scheme, that were made in furtherance of the scheme. These include email communications as well as verbal statements made by scheme participants to implement the Defendant's directives to maximize billings (regardless of actual need or use of available hours), which scheme participants enforced upon lower-level Cradle employees. These emails and verbal statements are admissible as statements as co-participants in the scheme.[2] The

[2] The emails are also admissible as Cradle business records under F.R.E. 803(6) with the content of such emails being used, not for the truth of matter asserted, but for the impact on the recipient. Further, some of the emails and verbal statements are directives and thus not assertions of fact precluded by the hearsay rule. "`Instructions to an individual to do something are ... not hearsay ... because they are not declarations of fact and therefore are not capable of being true of false.'" *Katzenmeier v. Blackpowder Prods., Inc.,* 628 F.3d 948, 951 (8th Cir. 2010) (quoting *United States v. Reilly,* 33 F.3d 1396, 1410 (3d Cir.1994)) (citations omitted).

hearsay exception provided for in F.R.E. 801(d)(2)(E) provides that out of court statements of participants of a scheme may be admitted into evidence under F.R.E. 801(d)(2)(E) in the same manner as acts or declarations of co-conspirators, whether or not a conspiracy is charged. *United States v. Kiefer*, 694 F.2d 1109, 1112 n.2 (8th Cir. 1982); *United States v. Miller,* 644 F.2d 1241, 1244 (8th Cir. 1981).

The scheme participants were senior administrative staff working at Cradle who reviewed Cradle's billings on a weekly basis and discussed them via email and weekly meetings. Recordings of these weekly meetings, taken by a mid-level staffer who will testify at trial, show that the Defendant participated in these calls in which her senior staff and scheme participants would pressure mid-level administrative staff to direct client-facing Cradle employees to "maximize" billings and bill for all of each client's allotted hours of service to meet "projections" of revenue created from the total of each clients allotted service hours. Anticipated employee testimony will show that client-facing Cradle staff were expected to explain and justify to management any time their allotted weekly hours for their assigned clients were not fully claimed on their timesheets.

A statement is not hearsay if the United States proves by a preponderance of the evidence that (1) a scheme or conspiracy existed, (2) the defendant and declarant were members of the scheme or conspiracy, and (3) the declaration was made during the course and in furtherance of the scheme or conspiracy. *United States v. Cathey*, 997 F.3d 827, 834 (8th Cir. 2021). As will be elicited at trial, the Defendant acted in concert with her senior staff and scheme participants to submit false and fraudulent claims for HSS services that were either not provided or provided at levels far below what Cradle claimed. In addition, the statements to be offered were made while Cradle was actively engaged in submitting HSS claims based on either rote and regular upcharging of actual service hours or were wholly invented service hours. The statements were furtherance of

the scheme in that they were either exhorting client-facing employees to claim more hours, complaining about such employees' failure to comply and discussing how to remedy the failure, or discussing steps to conceal the fraudulent basis for HSS claims made when employees did comply.

### 3. The United States Will Introduce Summary Exhibits to Present Voluminous Financial Records, Claims Data, and Tracking Spreadsheets.

The United States intends to introduce summary exhibits to make voluminous data understandable and digestible to the jury, including exhibits summarizing financial records, the claims submitted by Cradle to Medicaid, and the Cradle employee time entry programs used to make claims for the time spent on services purportedly provided.

These summary exhibits are admissible under Federal Rule of Evidence 1006, which provides "[t]he proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." The Eighth Circuit has repeatedly affirmed the admission of summaries. *See, e.g.*, *United States v. Goodwin,* 831 F. App'x 223, 223 (8th Cir. 2020) (per curiam) (listing cases); *United States v. Green,* 428 F.3d 1131, 1134 (8th Cir. 2005) ("Summary evidence is properly admitted when (1) the [exhibits] 'fairly summarize' voluminous trial evidence; (2) they assist jury in 'understanding testimony already introduced'; and (3) 'the witnesses who prepared the [exhibits] is subject to cross-examination with all documents used to prepare the summary.") (quoting *United States v. King*, 616 F.2d 1034, 1041 (8th Cir. 1980)).

Specifically, these summary exhibits will, in combination with other evidence, establish the falsity of the particular claims listed in the indictment. Further, the summary exhibits will include charts illustrating the repetitive and rote number of hours that were systematically billed by Cradle on behalf of its clients. The summary exhibits will also show the repetitive nature of

"client notes" made by client-facing employees to justify their service hours to comply with Defendant's directives to bill for all allotted service hours and maximize billing.

The exhibits will summarize and provide calculations for voluminous pages of bank records, claims data from spreadsheets with thousands of rows and more than a dozen columns, and timesheet data spreadsheets. The United States has produced and can admit the underlying records as exhibits at trial.

## III. **Defense Witnesses**

Based on communications with defense counsel, the United States believes that Defendant may choose to call former Cradle employees and contractors as witnesses who have potential criminal exposure for their roles in facilitating the charged fraud scheme. In light of such exposure, such witnesses may need appointed counsel to assess their decision to testify on behalf of the Defendant. *See United States v. Washington,* 318 F.3d 845, 855 (8th Cir. 2003) (prosecutor acted properly in notifying court of witness' possible need for appointed counsel); *United States v. Blanche*, 149 F.3d 763, 769 (8th Cir. 1998) (approving of district court decision to appoint counsel for defense witness to advise on question of Fifth Amendment invocation).

The United States has the right to perform a thorough cross-examination of defense witnesses. While such witnesses retain their right not to answer questions that may incriminate them, a defense witness's invocation of the Fifth Amendment on government cross-examination unfairly deprives the government of its adversarial right to cross-examination. *See United States v. Doddington*, 822 F.2d 818, 822 (8th Cir. 1987) (upholding district court's decision to strike defense witness testimony after witness asserted his Fifth Amendment rights.). As the court noted in *Doddington*, a defendant may not call a witness for the purpose of benefitting from inferences drawn from the witness's assertion of the privilege. *Id.* (citing *United States v. Lyons,* 703 F.2d 815, 818 (5th Cir.1983)); *see also United States v. Mahasin*, 362 F.3d 1071, 1086 (8th Cir. 2004)

(holding district court did not abuse discretion in concluding that exposing defense witness to cross-examination would expose witness to "real and substantial risk of prosecution.").

Litigation of these issues in front of the jury during testimony will be time-consuming, disruptive, and risks the jury hearing testimony from witnesses who ought properly to have been excluded based on their cross-examination responses.

## IV. Length of Trial

The United States anticipates that its case-in-chief will last approximately three to four days.

Respectfully submitted,

DANIEL N. ROSEN
United States Attorney
District of Minnesota

LORINDA LARYEA
Chief, White Collar and Corporate Enforcement
Criminal Division
U.S. Department of Justice

By: */s/ Jody King*
Jody King
Trial Attorney
Ohio Bar No. 94125
United States Department of Justice
1400 New York Avenue NW
Washington, DC 20005
202-262-7656
Jody.King@usdoj.gov

By: */s/ Brant Cook*
Brant Cook
Trial Attorney
MI Bar No. P86489
United States Department of Justice
211 West 4th Street
Suite 2001
Detroit, MI 48226
Phone: (202) 748-1224
E-mail: brant.cook@usdoj.gov

By: */s/ Emily Reeder-Ricchetti*
Emily Reeder-Ricchetti
Trial Attorney
DC Bar No. 252710
United States Department of Justice
1400 New York Avenue NW
Washington, DC 20005
202-355-5633
Emily.Reeder-Ricchetti@usdoj.gov