UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 26-CR-90 (SRN/ECW)

UNITED STATES OF AMERICA,

Plaintiff,

v.

SHARMAINE MEADOWS,

Defendant.

**GOVERNMENT'S RESPONSE IN OPPOSITION TO POST-CONVICTION MOTION FOR ACQUITTAL**

After a seven-day trial, a federal jury convicted Defendant Sharmaine Meadows of three counts of health care fraud and aiding and abetting health care fraud. The Court denied Defendant's motion for judgment of acquittal at the close of the Government's case. Trial Tr. 1007-08. Nothing that followed diminished the Government's proof, and the record now includes the jury's verdict of guilty. Defendant's current motion renews her request and asks the Court to do what Rule 29 forbids—weigh competing inferences and substitute the Court's reading of the record for the jury's. But as the Court held at trial, there was evidence sufficient for a reasonable jury to find the Defendant guilty. That is precisely what happened. Accordingly, Defendant's motion for acquittal should be denied.

## I. Standard of Review

Rule 29 allows a court to enter a judgment of acquittal if the evidence is insufficient to sustain a conviction. Fed. R. Crim. P. 29(a), (c). However, the standard for determining whether evidence is insufficient is "very strict." *United States v. Boesen*, 491 F.3d 852, 855 (8th Cir. 2007). Indeed, a post-verdict judgment of acquittal under Rule 29 is appropriate only when there is "no interpretation of the evidence"

that would allow a reasonable jury to find the defendant guilty beyond a reasonable doubt. *United States v. Gomez*, 165 F.3d 650, 654 (8th Cir. 1999). In making this determination, the Court must look at the evidence "in the light most favorable to the government, drawing all reasonable inferences and resolving all evidentiary conflicts in favor of the jury's verdict." *United States v. Aponte*, 619 F.3d 799, 804 (8th Cir. 2010). The Court is not to weigh evidence or assess the credibility of the witnesses. *United States v. Wallace*, 852 F.3d 778, 783 (8th Cir. 2017). Evidence supporting a conviction is sufficient "if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Weston,* 4 F.3d 672, 674 (8th Cir.1993).

**II. Analysis and Law**

The Defendant was convicted of three counts of health care fraud and aiding and abetting health care fraud, in violation of 18 U.S.C. §§ 1347 and 2. Health care fraud is comprised of four elements (Dkt. 98 at Inst. 11), but, as at trial, Defendant does not contest elements three and four. Rather, Defendant challenges the sufficiency of the evidence as to elements one and two (knowing and willful execution of a scheme to defraud, and intent to defraud), as well as the sufficiency of the evidence as to the elements that would establish aiding and abetting health care fraud. See Dkt. 98 at Inst. 13. As shown below, the evidence was sufficient to sustain a conviction on each of the three counts of conviction under either statute.

### i. Defendant's *mens rea* must be evaluated as to the scheme, not each individual execution

As a preliminary matter, Defendant misstates the *mens rea* § 1347 requires, applying the statute's scheme-level *mens rea* requirement to each individual execution. In rejecting Defendant's argument, the Court can start with the text of § 1347 itself: "[w]hoever knowingly and willfully executes, or attempts to execute, *a scheme or artifice* . . . to defraud any health care benefit program." 18 USC § 1347. The mental state thus attaches to the scheme; the individual execution provides the unit of prosecution. *See id*; 8th Cir. Model Crim. Jury Instr. 6.18.1347 & comments. It follows that the Government need not prove a discrete fraudulent intent as to each execution charged—and courts analyzing the sufficiency of intent evidence under § 1347 focus on the scheme, not whether the defendant formed intent anew at each execution. *See, e.g.*, *United States v. Boesen*, 541 F.3d 838, 849-50 (8th Cir. 2008) (describing evidence on scheme level); *United States v. Scully*, 877 F.3d 464, 479 (2nd Cir. 2017) (noting that "[a] jury may bring to its analysis of intent on individual counts all the circumstantial evidence it has received on the scheme and the purpose of the scheme in which the defendant allegedly participated," pointing to the evidence as to defendant in the overall scheme, and that "[t]he government need not present testimony from each victim of [defendant's] fraudulent scheme to prove intent") (quoting *United States v. Guadagna*, 183 F.3d 122, 129 (2nd Cir. 1999)); *United States v. Hunt*, 521 F.3d 636, 645 (6th Cir. 2008)(denying Rule 29 motion under the aiding and abetting theory, because "the evidence is sufficient to support a finding that [defendant] contributed to the execution of the scheme with the intent to defraud");

*United States v. Davis*, 490 F.3d 541, 549-50 (6th Cir. 2007) (stating that record provided ample support for jury inference that defendant had requisite intent "to be a participant in the health care scheme"); *United States v. Dearing*, 504 F.3d 897, 901-02 (9th Cir. 2007) (intent could be inferred where "evidence supports a finding that [the defendant] willfully participated in a Life Springs' fraudulent billing scheme"); *United States v. Udeokoro*, 2023 WL 4138477, at *5 (E.D.N.Y. June 22, 2023) (focusing on scheme evidence); *United States v. Palazzo*, 2008 WL 5381581, at *9 (E.D. La. Dec. 18, 2008) (focusing on defendant's knowledge regarding the scheme, rather than the individual invoices charged in each health care fraud count); *see also United States v. Jefferson*, 652 F.3d 927, 930 (8th Cir. 2011) (discussing circumstantial evidence of defendant's *mens rea* as to a wire fraud scheme, rather than the individual wire fraud charges).[1]

The Court's final jury instructions confirm as much. Tracking § 1347 and the model instructions, the Court charged the jury that to find the Defendant guilty, the jury must find that "the defendant knowingly and willfully executed or attempted to execute a *scheme to defraud Medicaid*" and did so "with intent to defraud." Dkt. 98 at Inst. 11 (emphasis added); *see also id.* ("The health care fraud counts of the Superseding Indictment charge that the defendant, along with others, devised or participated in the scheme to defraud."). The aiding-and-abetting instruction likewise focused on Defendant's knowledge and actions with respect to the *scheme*. *See* Dkt.

[1] The Government does not contend that the charged executions require no count-specific proof. The Government must prove that each charged claim was an execution of the scheme—and, as set forth in Part iii, below, it did.

98 at Inst. 13 (Defendant must have "had enough advance knowledge of the extent and character of the *scheme* to defraud that she was able to make the relevant choice to walk away from the *scheme"* and "all of the elements of health care fraud were committed by some person or persons and that defendant aided and abetted the commission of that crime") (emphasis added); *see also Rosemond v. United States*, 572 U.S. 65, 77-78 (2014). Defendant did not object to the Court's final instructions, Trial Tr. 1231, nor did she seek such an execution-level *mens rea* requirement with the initial, joint proposed instruction. *See* Dkt. 40 at 42 (Inst. MMCJI8 § 6.18. §1347 Health Care Fraud).

In reading an execution-specific requirement into the statute (and requiring it of the jury's verdict), Defendant does not meaningfully engage with § 1347's plain terms and identifies no authority imposing such a requirement. And for good reason. Her reading would immunize much of the conduct § 1347 targets: the design and operation of a practice that systematically generates false claims.

Put simply, the Government was required to prove that Defendant knowingly and willfully participated in a scheme to defraud with intent to defraud; that each claim charged was an execution of that scheme; and that she executed, or aided and abetted, its execution. As set forth below, the evidence was sufficient for a reasonable trier of fact to find that the Government did so for Counts Two, Four, and Five.

### ii. The evidence was sufficient to establish that Defendant knowingly and willfully executed or attempted to execute a health care fraud scheme, and had an intent to defraud

#### a. Scheme to Defraud

A scheme to defraud was defined in the jury instructions, without objection by the Defendant, as

> "any plan or course of action intended to deceive or cheat a health care benefit program out of money or property by employing material falsehoods, concealing material facts, or omitting material facts or causing others to do so. A scheme to defraud also can include the obtaining of money from a health care benefit program by means of material false pretenses, representations, or promises. A scheme to defraud need not be fraudulent on its face but must include some sort of fraudulent misrepresentation or promise reasonably calculated to deceive a reasonable person."

Dkt. 98 at Inst. 11. That instruction reaches a defendant who causes others to employ falsehoods or conceal material facts, and expressly provides that a scheme need not be fraudulent on its face. Defendant's arguments that she is somehow exonerated because it was Cradle's billing staff that submitted the claims, and that a weekly billing cadence was permissible, are foreclosed by the instruction. And the evidence established at trial that the Defendant's fraudulent scheme consisted of maximizing and evenly spreading hours billed to Medicaid, regardless of services provided, and maximizing profitability, regardless of program requirements and beneficiary needs. This scheme was proven by testimony, the Defendant's own statement, communications, and claims data.

Evidence at trial established that Defendant instituted a practice of requiring allotted hours to be "worked" each week for each of their clients in the Housing Stabilization Service ("HSS") Program. This was not a policy to "reserve" a set amount

of hours per week to ensure an individual's needs were met throughout the year; it was a direction to *bill* hours, week after week. Defendant readily admitted to federal agents that she directed her employees to spread out billed hours across the year at four to five hours per week. Trial Tr. 891 (FBI Supervisory Special Agent Kary). Former employee testimony and internal company communications confirmed this direction was repeatedly communicated to employees. *Id.* at 429 (Srae Sims testimony regarding recurring pressure on client-facing employees to use full allotted amount of hours); *id.* at 438, 447 (Sims testimony concerning Defendant's directions to maximize hours); *id.* at 466 (Jovaughn Okunowo testimony concerning expectations of employees); Govt. Ex. 306 (April 30, 2021, email from Defendant directing all available hours to be utilized); Govt. Ex. 319 (July 18, 2022, email copying Defendant, directing billing 3 hours a week); Govt. Ex. 315 (March 22, 2022 email copying Defendant, directing billing 3 hours per week); Govt. Ex. 320 (July 19, 2022, Meeting Agenda directing maximizing of hours). Claims data showed that Defendant's direction was followed. Govt. Ex. 2.

The Defendant has argued that this was simply a billing practice and did not constitute a scheme to defraud. This ignores the nature of the HSS Program, as well as testimony throughout trial. As discussed by the Program Manager for the HSS Program, Thomas Balsley, needs of HSS Program beneficiaries varied by individual and were expected to vary throughout the year of approved services. Trial Tr. 70-71. This was not a technical point known only to program specialists. The Defendant's former employee, Shenara Foster, confirmed it. *Id.* at 397-398. So did three of the Defendant's own trial witnesses: Nichelle Perteet (*id.* at 1068-1069), Ronette

Robinson (*id.* at 1130-1132), and Jerri Horne (*id.* at 1171-1173). Given the nature of the HSS Program, Defendant's directions provide circumstantial evidence of the scheme: it made little sense to require a level amount of hours to be "worked" and then billed to Medicaid, unless Defendant's focus was not on Program requirements and client need, but, instead, on maximizing profitability and guaranteeing a steady income stream. And doing so was an indicator of "program integrity concern" (Trial Tr. 162 (Balsley)), and "pattern billing" that is a strong indicator of potential fraud (Trial Tr. 742-743 (Doty)).

But more than that, Defendant knew her employees were struggling to fill the hours assigned, and kept the pressure on to maximize hours. Sims testified about frequent meetings with Defendant and her company's Chief Financial Officer, Tony Davis, at which hours were frequently discussed and Sims was required to justify why some employees fell short of allotted client hours. *Id.* at 425-27. Sims relayed to both Davis and the Defendant that some clients did not need the allotted hours. *Id.* at 429. Yet, week after week, the pressure to "work" the hours continued. *Id.* Indeed, Defendant's focus was whether employees were billing "enough" hours. *Id.* at 424. A jury could reasonably weigh this as evidence that a provider who learns that her company's billing targets exceed what clients need, and who responds by demanding that staff justify shortfalls rather than adjusting the policy, is not operating in good faith.

Defendant's scheme to defraud also included maximizing profitability, regardless of the needs or wants of HSS Program beneficiaries her company promised to serve. This was seen most clearly with Defendant's policies to use "housing

researchers" who were not from the Minneapolis area, and had never been to Minnesota, including Gail Singleton in the Chicago area, and "researchers" working from the Philippines. *See, e.g.*, *Id.* at 468-469 (Okunowo); Govt. Ex. 333 (email to Philippines researchers copying Defendant); Govt. Ex. 336. The Philippines housing researchers were paid $6 an hour (Govt. Exs. 206 and 207), while the HSS Program remitted more than $68 an hour. *See* Trial Tr. 88 (Balsley). Consistent with Defendant's other policies, the Philippines-based housing researchers were directed to work a specific 5 hours per week per client (Govt. Ex. 333), and Defendant directed that they work a level 80 hours in total every two weeks (Govt. Ex. 334).

In addition to being facially absurd to use non-local "researchers" in a Minnesota program focused on individualized need, Defendant's company policies ran afoul of multiple HSS Program rules and were not disclosed to clients. First, starting after May 2023 – a time period when "housing researchers" were still working hours assigned by the Defendant (*see, e.g.* Govt. Ex. 9 at 7-8) – only a certain percentage of the total hours billable to the HSS Program could be done remotely at all. Trial Tr. 98-99 (Balsley). Yet multiple clients who worked with the Defendant's company after the rule change in May 2023 testified at trial that they only very rarely, if at all, saw anyone from the Defendant's company. *Id.* at 96-596 (Davis); *id.* at 238 (Reid); *id.* at 330 (Schultz (guardian for client K.S.)); *id.* at 570 (Ndege (caregiver for A.T.)). And out of approximately 15,000 services the Defendant's company billed to Medicaid, less than 50 used the billing modifier for remote work that was required in the final years of the program. Govt. Ex. 100; Trial Tr. 663-664 (Doty). Second, as discussed *infra*, clients of Defendant's company were not advised that non-local researchers were

purporting to work on their behalf. Again, a jury could reasonably conclude that Defendant's participation in these policies, and that they led to fraudulent hours billed to the HSS Program, was circumstantial evidence of her knowledge and willful participation in a health care fraud scheme, and aiding and abetting of that scheme.

**b. Intent to Defraud**

Intent to defraud need not be shown by direct evidence; it may be inferred from all the facts and circumstances surrounding the defendants' action. *United States v. Wrehe*, 628 F.2d 1079, 1082 (8th Cir. 1980); *see also DeMier v. United States*, 616 F.2d 366, 369 (8th Cir. 1980). Defendant does not dispute this. Dkt. 110 at 4.

Much of what has already been discussed concerning the Defendant's scheme to defraud shows her intent. She created and enforced her company's HSS Program billing, pushing for the maximizing of billed hours. Trial Tr. 447 (Sims). She did so despite warnings from her hand-picked manager that the client-facing employees judged that the clients didn't need the full allotment of expected hours. *Id.* at 429, 447 (Sims). She directed a level amount of weekly hours to be billed across the year for each client, *supra*, and her employees complied, regardless of client need and actual delivery of services. *See* Govt. Ex. 2. She set up a scheme to use obviously unqualified housing researchers, in a way that maximized her profits, and that did not serve her clients and violated HSS Program rules.

The Defendant attempts to minimize violations of the HSS Program rules as showing intent to defraud by pointing to the Court's instruction to the jury regarding rules and regulations. *See* Dkt. 98 at Instr. 11. But she goes too far in characterizing the instruction as exclusionary rather than just limiting: the Court charged the jury

that "any potential violations of those rules and/or regulations and/or state statutes by the defendant are not sufficient *in and of themselves* to prove the charges alleged in the indictment." *Id.* (emphasis added). In short, the jury was told that rule violations could not alone establish guilt, not that it had to totally disregard them. The jury is presumed to have followed the Court's instructions. *See, e.g. Richardson v. Marsh*, 481 U.S. 200, 211 (1987); *United States v. Hansen*, 111 F.4th 863, 869 (8th Cir. 2024) ("For starters, we presume that the jury followed the district court's limiting instruction, and did not convict Hansen for improper reasons.") (citation omitted)).

The evidence established that these violations did not stand alone. Further, the evidence of noncompliance here was probative of precisely what the Defendant disputes—*mens rea*. Evidence at trial established that the HSS Program required that services be individualized and beneficiary driven, billed in fifteen minute units, that at least fifty percent be direct services, and, after May 2023, that much contact occur in person. Trial Tr. 80-82, 98-99 (Balsley); *see also* Govt. Ex. 110. Defendant was trained on these requirements, and witnesses, including the Defendant's own witnesses, testified that she was familiar with Program rules. Trial Tr. 1073-78 (Perteet); *id.* at 1175, 1180-82 (Horne); *see also* Govt. Ex. 302 (email to Defendant with HSS Program information); Govt. Exs. 357, 358, 359, 366 (examples of emails sent or received by Defendant relating to HSS Program training). As discussed extensively above, she nonetheless directed that Cradle of Love "maximize" billing, even when concerns were raised that the assigned hours did not match beneficiaries' needs. *Supra*. She was involved in the policy to "auto add" two hours of time for

researchers (Govt. Ex. 356), and the hiring and retention of employees located out of state and overseas. *Supra*. The jury could conclude that policies of pre-determining hours, applied to staff who could not have met beneficiaries in person, were not a good-faith attempt to participate in and legitimately profit from a program requiring individualized direct service. Combined with overwhelmingly whole-hour billing patterns across Cradle of Love's billing (*see* Govt. Exs. 2, 3, & 6), the evidence permitted the jury to find that Defendant was not operating in good faith but with intent to defraud.

The Defendant's intent to defraud is also shown by her actively disregarding obvious billing red flags, including warnings concerning HSS Program hours claimed by multiple employees, including Kinyatta Henry and Tamico Reed.

With respect to Kinyatta Henry, Ms. Henry's hours were specifically flagged as fraudulent, and she was initially slated to be fired. Govt. Ex. 327. She was, however, ultimately retained because there were not enough other employees to work the hours that she was assigned. Trial Tr. 524 (Okunowo); Govt. Ex. 328. This was not a one-time event: Defendant's Operations Manager testified that she recommended to Defendant multiple times that Henry be fired. Trial Tr. 508 (Okunowo). That did not occur, and Henry ended up "working" additional hours billed to the HSS Program, including impossibly long days billed to Medicaid. Govt. Ex. 19. Henry is representative of the scheme in a nutshell: an employee flagged for the Defendant for fraudulent hours was kept on precisely because the pre-determined hours needed to be filled.

Okunowo also raised concerns about Defendant's sister, Tamico Reed. Okunowo complained to Defendant that Reed's client notes mirrored one another, and that she consistently just marked down 3 hours for each client, rather than complying with the 15-minute unit billing increments of the HSS Program. Trial Tr. 547-548; Govt. Ex. 332. Others within Defendant's company testified regarding issues with Reed, including defense witness Ronette Robinson who recalled that Reed "was not suited" to the job and could "get away with more" because of her relationship with Defendant. Trial Tr. 1135-1136. And, as shown at trial, Reed's hours on the HSS Program – benefitting the Defendant – were consistently reported as *very* high. Govt. Ex. 337 (Reed notes sent to Defendant showing whole-hour, repetitive time entries); Govt. Ex 344 (consolidated payroll emails to Defendant showing pattern of extremely high biweekly hours claimed by Reed in the HSS Program); Govt. Ex. 336 (payroll email showing an example of Reed claiming high hours for the HSS Program). Despite these issues, Reed continued to work for Defendant's company and her purported "work" hours billed to the HSS Program. This included yet more of the 21-hour days billed to the HSS Program. Govt. Ex. 18. And it included, as discussed below, falsifying hours and time worked for clients (including S.R.) of Defendant's company.

That Defendant knew Henry and Reed were falsely claiming hours is circumstantial evidence of her mental state and intent to defraud the HSS Program. She could have carried through on firing Henry; she did not. She could have put a stop to Reed's mirrored case notes and investigated whether she was actually doing the work she claimed; she did not. A jury had sufficient evidence to determine that Defendant's focus was not on running a legitimate business; rather, her focus was on

making money, and Henry and Reed facilitated that for Defendant through known false billing. The evidence clearly established that she had an intent to defraud.

#### iii. Individual Executions of the Defendant's Health Care Fraud Scheme

The foregoing establishes the scheme, Defendant's role in it, and Defendant's intent to defraud. The sections that follow establish that the evidence for each charged claim was sufficient to establish beyond a reasonable doubt that they were executions of the scheme and that Defendant was legally responsible for them.

##### a. The evidence was sufficient to support the jury's guilty verdict on Count Two

Count Two alleged that a claim submitted on or around October 24, 2023 to beneficiary S.R was an execution of the charged health care fraud scheme. The evidence presented at trial provided a sufficient basis for the jury to find that the claim was false and fraudulent and an execution of the broader scheme.

First, the Cradle of Love records associated with the October 24, 2023, services billed to Medicaid claimed that those five hours included direct contact by Ms. Reed with S.R., specifically that she: "gave [S.R.] a call at 7:40 to go over places I sent to her and the places she sent back to me she wanted me to put an application for and do a follow up with some of the places[.]" Govt. Ex. 8 at 2. Beneficiary S.R. testified that from October 19 through October 26, she was seriously ill and hospitalized, she did not talk to anyone from Cradle of Love during this time, was not aware of any services provided, and did not give them permission to submit claims to Medicaid during this period. Trial Tr. at 236-37; *see also* Govt. Ex. 701 (hospital records reflecting S.R.'s hospital stay from October 19 through October 26, 2023). The

evidence also established that this false October 24, 2023 claim was part of a pattern of rote 5 hour claims throughout the October through November 2023 time period. *See* Govt. Ex. 8 at 2.

More general evidence about the services (or more accurately, lack of services) that S.R. received from Defendant's company further supported a jury finding that the October 24, 2023 claim was false and fraudulent, *and* that it was an execution of the Defendant's fraud scheme. S.R. testified that:

- S.R. never met an employee from Cradle of Love in person, and probably spent less than three to five hours total on the phone with employees (Trial Tr. 238);
- S.R. never met Tamico Reed in person and they at most had weekly calls of five to ten minutes before S.R. was told that she had "run out of hours" (*id.* at 230-31);
- S.R. never had any calls with Reed at 7:00 or 8:00 in the morning (*id.* at 232)[2];
- S.R. at times had a hard time getting ahold of Reed (Trial Tr. at 233);
- S.R. never saw any apartment applications or heard from any of the apartments to which Cradle of Love had purportedly applied (*id.* at 232-33);
- S.R. was never asked by Cradle of Love if she wanted to go tour apartments, and they never helped her do so (*id.* at 248);
- S.R. did not recall receiving or signing any documents from Cradle of Love (*id.* at 234)
- No one at Cradle of Love ever discussed with S.R. using an overseas "housing researcher" (*id.*).

In stark contrast to S.R.'s unrebutted testimony that she received little to no services, summaries of S.R.'s HSS Program claims data showed that Defendant's company billed Medicaid for over 550 hours, and that most claims were billed in 5-hour increments. *See* Govt. Ex. 3; *see also* Trial Tr. 742-43 (Doty testimony regarding

---

[2] Of note, this is contrary to numerous internal records claiming such calls, including the records for the October 24, 2023 claim (*compare* Trial Tr. 232 *with* Govt. Ex. 8).

pattern billing); *id.* at 770-71 (explaining pattern billing as an indicator of fraud on cross-examination); Govt. Ex. 8 (summaries of claims data and internal records showing total billed and paid, and patterns for billed claims), Govt. Ex. 319 (email including Defendant noting Cradle of Love would "bill" S.R. at 3 hours per week) and Govt. Ex. 356 (email including Defendant noting that the company billed would "auto add" two hours to every billing for "researchers," and would increase profits). Finally, evidence also established that Reed's claimed HSS hours across multiple beneficiaries were suspect, that the Defendant knew it, and that Cradle continued to bill for her time anyway. *Supra* at pg. 13 (discussing evidence and testimony regarding Ms. Reed). The October 24 claim was an execution of the scheme operating as Defendant designed, or at minimum a claim which she aided and abetted: a pre-determined five-hour block, claimed by an advocate whom Defendant knew to be unreliable, and billed for a beneficiary who was hospitalized and receiving no services at all.

Defendant attempts to dismiss all of this—ignoring the actual evidence regarding the October 24, 2023 claim, S.R.'s lived experiences with Cradle of Love, and the broader scheme and Defendant and her sister Tamico Reed's central role in it—by pointing to a speculative "possibility" that the Count Two billed hours were spent on indirect "housing-transition work." Dkt. 110 at 6-7. But this *possible* alternate explanation is not just unsupported by the evidence, it is wholly inconsistent with it. Even if there was any evidence whatsoever to support such a theory, "one possible innocent explanation for the government's evidence does not preclude a reasonable jury from rejecting the exculpatory hypothesis in favor of guilty beyond a reasonable doubt." *United States v. Johnson*, 474 F.3d 1044, 1050 (8th Cir.

2007) (quoting *United States v. Maloney*, 466 F.3d 663, 667 (8th Cir. 2006). Here, the jury did just that. Weighing the documents and testimony, the jury's verdict reflects a reasoned determination that the evidence, coupled with the evidence showing the broader scheme, proved beyond a reasonable doubt that this claim was both false and fraudulent, and that it was Defendant's scheme caused it—that is, that the claim was billed as an execution of the scheme.

**b. The evidence was sufficient to sustain the jury's guilty verdicts on Counts Four and Five**

Counts Four and Five alleged that claims submitted on or around October 19 and October 26, 2022 for services purportedly provided to beneficiary M.F. were additional executions of the Defendant's health care fraud scheme. Like Count Two, the evidence presented at trial was sufficient to sustain the jury's verdict on these Counts.

The evidence showed that the hours underlying Counts Four and Five were based on hours claimed by Cradle of Love employee Kaleb Dowd, who claimed to have provided six hours of services to M.F. on October 19, and six more on October 26, 2022. Govt. Ex. 11; Govt. Ex. 15. Cradle of Love's own records established that these hours were not worked. An internal review conducted by Cradle of Love employee Jovaughn Okunowo examined hours Mr. Dowd claimed for multiple beneficiaries in October 2022 and determined that, among other false entries, he had falsely claimed six hours of services to M.F. on each of those dates. Govt. Ex. 326; Trial Tr. at 485–89. M.F.'s testimony further confirmed that she never met Mr. Dowd, was not aware of any services provided in October 2022, and did not even recognize Mr. Dowd's

name. Trial Tr. at 819, 832. Defendant argues that Mr. Dowd's conduct "was his" and Cradle's internal detection cuts against the Government. Dkt. 110 at 8-9. Not so. The internal review establishes that the claims are false, and the billing regardless is circumstantial evidence of a scheme operating as planned. A rational juror could find on this evidence alone that the charged claims sought reimbursement for services that were never provided, and that it was not a mistake but an execution of the scheme.

More general evidence about M.F.'s experience with Cradle of Love further supported the jury's determination that these October 19 and 26 claims were false and executions of the Defendant's scheme. M.F. testified:

- She did not meet any Cradle of Love employee in person (Trial Tr. 820);
- She never spent more than 30 minutes on the phone with a Cradle of Love employee (*id.* at 821);
- Cradle of Love did not send her listings of places to live (*id.*);
- Cradle of Love did not do anything for her (*id.* at 824-25), and it surprised her that they never found her housing (*id.* at 830);
- M.F. later received housing services from a different company and they were able to find her housing quickly (*id.* at 825, 829)

Against that record of inaction, Cradle of Love billed Medicaid for over 440 hours of housing stabilization services for M.F., and these claims followed the same patterns which permeated Cradle of Love's operations. *See* Govt. Ex. 6 at 2 (showing claims submitted in almost entirely whole-hour increments, despite requirement to bill in 15 minute units, and generally for 5, 7, 2, or 3 hours at a time) and Govt. Ex 11 (examples of rote entries and associated claims, including those in Counts Four and Five). A juror could reasonably infer that hours recorded in uniform whole-hour

blocks, for services the beneficiary testified she never received, reflected a practice of billing time irrespective of accuracy. That inference supplies what the statute requires: the charged claims were executions of the Defendant's scheme, not isolated billing errors.

#### c. The evidence was sufficient for the jury to find that Defendant executed, caused, or aided and abetted the submission of the false claims charged in Counts Two, Four, and Five

While it is true that Defendant did not personally submit the Medicaid claims charged in Counts Two, Four and Five, she did not need to. Under the Court's instructions, the Government could prove either that Defendant executed the scheme herself, including causing the submission of claims, or that she aided and abetted its execution. Dkt. 98 at Inst. 11, 13. The evidence established both.

Defendant made the representations that enabled Cradle of Love to bill Medicaid at all. Cradle of Love's billing authority rested on Defendant's promise that she would return to Medicaid any claims billed in error or from fraudulent billing. See Govt. Ex. 106 at 3; Trial Tr. at 146-47. She personally executed that representation on Cradle of Love's behalf. *Id.* Every claim the company submitted, including those charged in Counts Two, Four, and Five, issued under authority she obtained. Defendant also by her own admission knew of and reviewed Cradle of Love's billing and was ultimately responsible for it. Trial Tr. at 889-94, 966, 980-81. Defendant caused the submission of all of the claims made by her company.

In response, Defendant emphasizes the Court's instruction that "[m]ere presence, knowledge, or association is insufficient." Dkt. 110 at 8-9 (quoting Dkt. 98

at Instr. 13). But the Government's proof was not mere presence. Defendant obtained Cradle of Love's billing authority by representing that erroneous claims would be returned; she directed and oversaw company policies to maximize hours billed and maximize profitability above all else; and she retained employees even after she knew they were problematic, including Mr. Dowd and Ms. Reed (*see supra*), and it was established at trial that employee hours "worked" on the HSS Program were billed to Medicaid following biweekly payroll meetings that Defendant very regularly attended. Trial Tr. 310, 316 (Latoya Hilton testimony concerning payroll and submission of claims). And with respect to Counts Four and Five, the evidence established that Defendant was informed that specific hours claimed by Mr. Dowd for M.F. were false (Govt. Ex. 326) and left the associated claims in place while her company retained the payments. That is knowing conduct for the purpose of aiding the fraud, not passive awareness of it.

In sum, viewing the evidence in the light most favorable to the verdict, a rational juror could find beyond a reasonable doubt that the claims charged in Counts Two, Four and Five sought payment for services never provided, that they were executions of the scheme to defraud Medicaid, and that Defendant aided and abetted their execution with intent to defraud.

## CONCLUSION

The jury, after hearing all the evidence—including a defense case involving multiple witnesses—found the Defendant guilty of three counts of health care fraud. As the Court held at the close of the government's case-in-chief, a reasonable jury could find the Defendant guilty of the counts charged. And, indeed, a reasonable jury did. The motion for acquittal should be denied.

Date: November 3, 2026

Respectfully submitted,

COLIN M. MCDONALD
Assistant Attorney General
National Fraud Enforcement Division

DANIEL N. ROSEN
United States Attorney
District of Minnesota

*s/Brant Cook*
BRANT COOK
Trial Attorney
Health Care Fraud Section
211 W. Fort St., Suite 2001
Detroit, Michigan 48226
(202) 748-1224
brant.cook@usdoj.gov
MI Bar No. P86489

*s/ Emily Reeder-Ricchetti*
EMILY REEDER-RICCHETTI
Trial Attorney
Health Care Fraud Section
1400 New York Avenue NW
Washington, DC 20005
(202) 355-5633
Emily.Reeder-Ricchetti@usdoj.gov
DC Bar No. 252710